Marcus L. CARGLE, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–94–763.

Court of Criminal Appeals of Oklahoma.

Dec. 22, 1995.

Rehearing Denied Feb. 8, 1996.

Michael Gassaway, Oklahoma City, Trial Counsel for Appellant.

Robert H. Macy, District Attorney, Fern Smith, Assistant District Attorney, Oklahoma City, Trial Counsel for Appellee.

Cindy G. Brown, Appellate Defense Counsel, Capital Direct Appeals Division, Oklahoma Indigent Defense System, Norman, Appellate Counsel for Appellant.

W.A. Drew Edmondson, Attorney General of Oklahoma, Robert Whittaker, Assistant Attorney General, Oklahoma City, Appellate Counsel for Appellee.

## OPINION

LUMPKIN, Judge:

Appellant Marcus L. Cargle was tried by a jury in the District Court of Oklahoma County, Case No. CF–93–6982, and convicted of Count I and Count II, Murder in the First Degree (21 O.S.1991, § 701.7(A); and Count III, Possession of a Firearm After Former Conviction of a Felony (21 O.S.Supp.1992, § 1283). For the weapons charge he received a sentence of ten (10) years. The

prosecution sought the death penalty on each murder count, alleging (1) The defendant was previously convicted of a felony involving the use or threat of violence to the person (21 O.S.1991, § 701.12(1)); (2) The defendant knowingly created a great risk of death to more than one person (21 O.S.1991, § 701.12(2)); (3) The murder was especially heinous, atrocious, or cruel (21 O.S.1991, § 701.12(4)); (4) The murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution (21 O.S.1991, § 701.12(5)); and (5) The existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society (21 O.S.1991, § 701.12(7)). On Count II, the jury found the presence of all five aggravating circumstances; on Count I, the jury found all but number 4, that the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution. After making these findings, the jury recommended Appellant be sentenced to death for each murder count. The trial court sentenced accordingly. It is from this judgment and sentence that Appellant appeals. We affirm.[1]

## I. FACTS

Richard Paisley was a woodcarver. He and his wife Sharon had moved into a house on North Westminster in far northeast Oklahoma City to study southwestern art forms. They planned to stay temporarily, then return to their families in the Carolinas. While in Oklahoma City, they apparently also sold marijuana. It was the prosecution's theory they sold bad marijuana to Appellant and his friends, and this sale led to their deaths.

The Paisleys' neighbor last saw Richard alive on September 24, 1993, when he came to the neighbor's house to borrow money. He said he needed $200 to save a trip into town, and he would repay the loan the next day. Richard offered the neighbor, Larry Dhooge, a couple of checks as collateral; Dhooge refused the offer, and loaned Paisley the $200. Dhooge sent his sons to the house the next day, a Saturday, to collect on the debt and to give the Paisleys a package

addressed to them which had been delivered to the Dhooge house. The two boys found the bodies: Sharon was lying on the floor in the living room, Richard was lying in the doorway to the bedroom. Each had been shot in the head, and Richard had also been shot in the chest. The Dhooges recalled the Paisleys' lights were on and the television was off when they returned to their house between 11 and 11:30 p.m. Friday; usually, the lights were off and the television was on at that time.

Authorities got a break in the case in November 1993, when a man arrested for domestic violence sought to make a deal with authorities. In early October, the county jail inmate, Luke Jones, had been living with Appellant at Appellant's parents' house. Appellant had approached Jones and wanted to know if God would forgive him for murder. After being assured by Jones this would occur, Appellant said he had gone through some changes, and had killed a man and woman (whom he described as hillbillies from the Carolinas) out by Spencer, a municipality in northeastern Oklahoma County. Appellant said "Todd" had shot the man, and he had shot the woman. They had gone to the residence after the Paisleys had sold them some bad marijuana. "Todd" was later identified as Christopher Todd Williams.

Authorities arrested Appellant, who admitted being at the scene but denied killing anyone, blaming both murders on Williams. Appellant told them a third person, Christopher Todd Jackson, would corroborate this.

Instead of corroborating Appellant, Jackson told authorities essentially what Jones had said. They had gone to the Paisley residence to get money back for some bad marijuana. Richard did not have the money, but went to a neighbor's and returned with it in a few minutes. He returned the purchase price, saying he did not want any trouble. Williams then asked to use the restroom. When he came out, he was carrying a Tech–9 semiautomatic weapon. He approached Richard and shot him once in the chest. Richard lunged at Williams, who then shot

1. In so doing, we note the following: the Petition in Error in this case was filed January 6, 1995; it was fully briefed and at issue July 6, 1995; and it was submitted to this Court on July 11, 1995.

him in the neck. When Richard fell to the floor and was attempting to crawl away, Sharon dived onto the floor from the couch where she had been sitting. At that point, Appellant pulled out a .22 caliber handgun and shot Sharon in the head twice, pausing between shots to unjam the pistol. Authorities discovered a .22 pistol inches away from Sharon's hand; it appeared Sharon was reaching into a box for the weapon when she was shot. As Appellant shot Sharon, Williams then approached Richard as he was crawling away, put the pistol to his head, and shot him a third time. Williams then took a television and a video cassette recorder from the residence.

Other facts will be introduced as they become relevant.

## II. PRE-TRIAL ISSUES

### A.

■ For his first proposition of error, Appellant contends he was denied his right to equal protection under the law when the trial court refused to provide a copy of his preliminary hearing transcript at State expense.

The State on appeal does not dispute the general principle of law that denial of a preliminary hearing transcript to an indigent defendant because he cannot pay for it violates the equal protection clause of the Fourteenth Amendment to the United States Constitution. *Roberts v. LaVallee*, 389 U.S. 40, 42, 88 S.Ct. 194, 196, 19 L.Ed.2d 41 (1967). However, the State also points out a defendant's indigency alone does not relieve trial counsel from a duty to act with due diligence in acquiring the transcript. We have held an accused is entitled to a transcript of a preliminary hearing where: (1) defense counsel acted with due diligence to acquire the transcript; and (2) the transcript is necessary for cross-examination of witnesses at trial. *McMillion v. State*, 742 P.2d 1158, 1160–61 (Okl.Cr.1987); *Wilson v. State*, 701 P.2d 1040, 1041 (Okl.Cr.1985); *Bryant v. State*, 471 P.2d 948, 949 (Okl.Cr.1970). Failure to provide a transcript when these requirements are met will result in reversal of a subsequent conviction. *Wilson*, 701 P.2d at 1041. We therefore turn to the record to

determine whether the conditions for the transcript were met. We find the following information pertinent:

The charge was filed November 15, 1993. Attorney Michael Gassaway appears to have been retained as the attorney of record from the beginning. On March 1, 1994, Gassaway filed an application to withdraw as attorney of record, citing lack of agreed payment (O.R.24). The record does not show a disposition of that motion; however, Gassaway represented Appellant at trial.

Appellant filed several motions on March 16, 1994 (O.R. 34–107). Request for preliminary hearing transcript was not one of them. On March 18, Gassaway filed a motion for the transcript, saying he would present a pauper's affidavit if necessary (O.R. 135). In response, the prosecution simply argued: "Defendant has private, retained counsel. The preliminary hearing in this matter was not lengthy." (O.R. 145). The district court on May 12, 1994, issued an order addressing several of Appellant's motions; the motion for a preliminary hearing transcript at state expense was not addressed (O.R. 153).

■ It is evident trial counsel did not act with due diligence in seeking the preliminary hearing transcript. When he filed his first application for the transcript, it was not accompanied by a pauper's affidavit. Since trial counsel had been retained, the affidavit would be necessary to show the court the defendant had *no money for a transcript*. This Court has stated that absent some specific showing of indigency by affidavit or testimony, this Court cannot speculate that the defendant was, in fact, without funds; this would be true even if counsel were court-appointed. *Marton v. State*, 809 P.2d 671, 672–73 (Okl.Cr.1991) (citing *Cook v. State*, 487 P.2d 1373, 1375–76 (Okl.Cr.1971)). Therefore, the trial court did not err even if it did not act on the first application.

A second application was filed May 31, 1994, accompanied by a pauper's affidavit (O.R. 175, 177). The docket sheet shows that on June 2, 1994, the motions for continuance

and transcript at public expense were denied because defense counsel was not present.[2]

The record shows an application to rehear defendant's motion for continuance and request for transcript at public expense was filed June 7, 1994 (O.R. 228). The court on June 10 issued an order denying both motions (O.R. 283). The order denying was not filed until June 20; trial began that same day. The issue was not raised on the record during trial proceedings.

■ We find trial counsel did not act with due diligence in pursuing his request. Counsel was not present on the day the motion was set for a hearing. Therefore, the trial court acted properly in denying the motion. *See* 12 O.S.1991, Ch. 2, App. 1, *Rules of the District Courts of Oklahoma,* Rule 4(f).[3]

We must also address another factor: whether the transcript would have been useful in cross-examining witnesses at trial. Appellant has also filed a claim counsel was ineffective based—at least in part—on his failure to obtain a preliminary hearing transcript, and we address the particulars of this factor below. *See* discussion of proposition

2. The docket sheet reads as follows: "State appears DFS atty does not both motions are overruled for failure to present." (Supp O.R. 40).

3. Nor are we influenced by defense counsel's motion for rehearing on the issue. We find nothing in any rules requiring a trial court to reconsider a motion after it was denied for failure to present. We do note that defense counsel's request the trial court reconsider its decision was filed on June 7, less than two weeks before trial. We also observe, as Appellant did, that the court ordered the preliminary hearing transcript prepared on July 6, 1994, as a part of the appellate record; and that the transcript was filed July 14 with the district court clerk. He cites this in support of his claim the reporter could have prepared the transcript in a timely manner for use at trial. This fact we do not consider. Appellant has presented nothing showing the court reporter did not begin work on the transcript until ordered to do so, even though she knew Appellant had been convicted of a capital crime, an appeal of which is automatic. More important, we refuse to engage in 20–20 hindsight by using information the trial court could not have in front of it at the time defense counsel asked the court to reconsider its ruling. The issue is whether trial counsel used due diligence in attempting to obtain a copy of the transcript, not whether the transcript could

12, *infra* at opinion section VI. Suffice it to say here any failure of Appellant to have a preliminary hearing transcript was harmless, and no equal protection violation occurred.

Trial counsel did not exercise due diligence in support of his motion for a preliminary hearing transcript, and the trial court did not err in refusing to order one prepared at State expense.[4] There is no merit to this first proposition of error.

### B.

For his second proposition of error, Appellant contends his right to due process was violated when the court failed to order a professional examination to determine whether he was competent. The record reflects his attorney filed an application for determination of competency on June 20, 1994, the day trial proceedings began. In it, defense counsel believed Appellant was incompetent, as he appeared incoherent, was talking to himself, and holding his private parts during a conference with his attorney the weekend before trial. The attorney said Appellant kept asking for his attorney, as if he did not know who his attorney was, and he "continu-

have been prepared in a timely fashion. Here, he did not.

4. Appellant points out that this Court in *Spain v. District Court of Tulsa County,* 882 P.2d 79 (Okl. Cr.1994), did not indulge in a "20/20 hindsight determination of whether the transcript was used to impeach a witness." It is sufficient to note here that *Spain* came before this Court in a different posture. There, the defendant's attorneys were before this Court on a petition for alternative writ of prohibition and/or mandamus, seeking to vacate an order of the district court denying a request for a copy of the transcript of the preliminary hearing at public expense. There, the petitioner's attorneys had obligated themselves to pay for the transcript, and were merely seeking an order for reimbursement *Id.* at 80. Therefore, this Court was not faced with a situation where a defendant was denied a transcript. Furthermore, the procedure of petitioning for a writ of mandamus which was used in earlier cases has been labeled "dicta" which this Court no longer followed. *McMillion,* 742 P.2d at 1161. Rather, the *McMillion* Court observed that "[m]ost recently, this Court has required that the indigent's counsel act with due diligence to acquire the transcript and that the transcript be necessary for cross-examination of witnesses at trial." *Id.* Consequently, *Spain* does not avail Appellant here.

ally behaves in manners that not only appear to be incoherent but abhorrent.... and when you talk to him about matters of insignificance·he appears to be a regular type guy. You can talk to him about O.J. Simpson,[5] but you can't talk to him about himself." The court observed it was fairly common for a defendant to attempt to avoid his problems. Appellant claims this attitude of the court was error.

■ The statutes governing "competency" cover two requirements: a defendant must have sufficient ability to consult with an attorney; and the defendant must be able to understand the nature of the charges and proceedings being brought against him. 22 O.S.Supp.1992, § 1175.1; *Smith v. State,* 819 P.2d 270, 273–74 (Okl.Cr.1991), *cert. denied,* 504 U.S. 959, 112 S.Ct. 2312, 119 L.Ed.2d 232 (1992).

■ Appellant must make a threshold showing he is incompetent. If that is done by the filing of a proper application, the court must hold a hearing to examine the application. The court may also entertain other evidence pertinent to the question at that hearing. If the court finds the application raises a doubt regarding the defendant's competency, an order for an examination by qualified medical personnel is entered to examine the defendant and determine if he can appreciate the nature of the charges; if he is capable of assisting his attorney; whether a defendant, if incompetent, can attain competency; whether the defendant is mentally ill, and whether he poses a threat to himself or others if released without treatment. 22 O.S.Supp.1993, § 1175.3. Following this initial determination and upon application, the court is required to hold a hearing on the competency issue. At that hearing, the defendant is presumed competent, and must prove by clear and convincing evidence he is incompetent. 22 O.S.1991, § 1175.4.

We find no error here, because we find Appellant failed to make the threshold showing. The applicable statute reads in pertinent part:

A. No person shall be subject to any criminal procedures after he is determined to be incompetent except as provided in Sections 1175.1 through 1175.8 of this title. The question of the incompetency of a person may be raised by the person, the defense attorney, or the district attorney, by an application for determination of competency. The application for determination of competency shall allege that the person is incompetent to undergo further proceedings, and *shall state facts sufficient to raise a doubt as to the competency of the person.* The court, at any time, may initiate a competency determination on its own motion, without an application, if the court has a doubt as to the competency of the person.

22 O.S. § 1175.2 (emphasis added); *see also Phillips v. State,* 650 P.2d 910, 912 (Okl.Cr. 1982) (discussing sanity statute). In discussing the term "doubt" (as used with competency and sanity), this Court in *Reynolds v. State,* 575 P.2d 628 (Okl.Cr.1978) stated:

It is well-settled in Oklahoma that the doubt referred to in the statute is that doubt which must arise in the mind of the trial court. The trial court may look to the source of the information and motive in determining whether there is doubt which would justify a sanity hearing, and the existence of a doubt as to defendant's sanity must arise from facts of a substantial nature. There must exist reasons to believe that the defendant's claim of insanity is genuine and not simulated to delay justice, and the finding of the trial court will not be disturbed on appeal unless a clear abuse of discretion is shown.

*Id.* at 633. *See also Russell v. State,* 528 P.2d 336, 340 (Okl.Cr.1974). In discussing how the "doubt" can be raised we said in *Berwick v. State,* 94 Okl.Cr. 5, 229 P.2d 604 (1951):

This doubt may arise in the mind of the court upon application for a continuance, motion for a new trial, motion in arrest of judgment, by ex parte affidavit or declaration of a bystander, or the court of its own motion; and while the court cannot act

---

**5.** O.J. Simpson is a former professional athlete and actor who was charged with the murder of his wife and her friend. The Simpson trial generated a great deal of nationwide publicity.

arbitrarily in the matter, it has the right to look to the source of the information, and come to a proper conclusion, from all the facts and circumstances, whether there is a doubt in his mind as to the sanity of the defendant. He may also consider the fact that the question of insanity was never raised. (quoting *Johnson v. State*, 73 Okl. Cr. 370, 121 P.2d 625 (syllabus 4)). *Id.* at 9–10, 229 P.2d 604.[6] Considering the question what constitutes a reputable source, this Court equated it with "a statement . . . made to the court by credible person, or persons, under oath. . . ." *Id.*[7]

■ It is evident Appellant failed to meet the requirements of Section 1175.2 in this case. A brief hearing was held, at which Appellant testified. During that hearing, he knew his name and identified Gassaway as his attorney; although he thought he was represented by other attorneys, he understood Gassaway was really his counsel. He knew he was charged with murder and that "they want to kill me." He said he understood other punishments for murder but the death penalty was "the only one that's sticking to me." He also knew his age; the names of his parents; the name of his church and his pastor's name; the year and the approximate date he was incarcerated.

This is sufficient to show that Appellant knew the nature of the crime with which he was charged and the range of punishment. And even assuming he may have believed another attorney was his defense counsel—a statement which is contradicted by Appellant's acknowledgement during questioning Mr. Gassaway was his counsel—this does not detract from the fact he was capable of assisting his attorney with his defense.

Based on the evidence before it, the court did not err in refusing to order a competency examination, as the facts were not "sufficient to raise a doubt" in the court's mind concerning the defendant's competency. *See Fox v. State*, 524 P.2d 60, 65 (Okl.Cr.1974) ("It is

not sufficient for the defense counsel merely to say that he is unable to communicate with his client; and, that his client's mental processes seem to waver while he is discussing the case with him; and, that his client does not understand the seriousness of a charge, to constitute justification for a finding that the defendant is mentally incompetent. In considering this question it is necessary that we consider the entire record."). *See also Middaugh v. State*, 767 P.2d 432, 434–35 (Okl.Cr.1988) (mere fact appellant had been treated for a mental condition in the past, had a heart condition, and had a nervous condition was not enough to raise a sufficient doubt as to his mental capacity to stand trial—especially in light of his testimony to the contrary); *Siah v. State*, 837 P.2d 485, 487 (Okl.Cr.1992) (lack of memory from substance abuse, trauma or a disease, does not create, *per se*, a lack of competence to stand trial).

We see no abuse of discretion here, as we find the court's ruling is reasonably supported by competent evidence. *Siah*, 837 P.2d at 487. Accordingly, this proposition is without merit.

### C.

■ From the record it appears certain pretrial hearings in this case were not recorded. Citing *Van White v. State*, 752 P.2d 814 (Okl.Cr.1988) and *Kelly v. State*, 692 P.2d 563 (Okl.Cr.1984). Appellant contends this failure mandates reversal.

We do not agree. We have since revisited that holding noting that the

> primary need for a complete record in all death penalty proceedings is to allow an appellate court to determine whether the factfinder imposed the punishment of death as a result of any improper influence, and whether the evidence supports such a finding. In other words, the portion of the mandatory sentence review that

---

**6.** We are, of course, cognizant there is a legal difference between sanity and competency under Oklahoma law. *Cf.* Sections 1161 through 1170 of Title 22, and Sections 1175.1 through 1175.8 of Title 22. However, we find no reason why the term "doubt" as used in the statutes dealing with sanity cannot be used in statutes dealing with competency to the extent the statutes govern trial proceedings.

**7.** Although he made a statement as an officer of the court, Appellant's attorney did not testify in support of the application.

concerned this Court in *Van White* and *Kelly* dealt with issues at trial, as it is during trial the jury or judge actually makes the determination whether the death sentence should be imposed. Therefore, that is the essential portion of the proceedings this Court requires to determine if the sentence were imposed in violation of the Eighth Amendment. And while this Court is also required to consider "any errors enumerated by way of appeal," 21 O.S.1991, Sec. 701.13(B), those other errors do not necessarily always implicate the Eighth Amendment—or any constitutional provision, for that matter. If alternate means exist for this Court to make a determination without the complete transcription, it will do so, and reversal is not warranted. *See Van White,* 752 P.2d at 819 (rejecting Appellant's argument that reversal was mandated because a motion hearing was not transcribed, as this Court could make a finding that the trial judge's ruling was supported by competent evidence without the transcript).

*Allen v. State,* 871 P.2d 79, 87 (Okl.Cr.), *cert. denied,* — U.S. —, 115 S.Ct. 370, 130 L.Ed.2d 322 (1994). We find we can discern from the record here that none of the hearings at issue dealt with the actual sentencing proceeding, where a complete record is most crucial. While Appellant has noted disposition of several motions were entered in these unrecorded hearings, he has presented nothing showing this Court how these pretrial hearings in any way influenced the jury in its sentencing deliberations, nor has he presented us with anything showing any implication on the mandatory sentence review this Court is required to conduct. *See also Parker v. State,* 887 P.2d 290, 294–95 (Okl.Cr.1994). Additionally, although he complains the hearings were not recorded, he has presented nothing showing this Court why this failure to record has prejudiced him in any way, as "[p]roblems involving the rulings resulting from the conferences are easily appealed in their own right." *Parker,* 887 P.2d at 294. The only hearing Appellant specifically notes is the hearing at which his request for a preliminary hearing transcript at State expense was denied. We have dealt with that

issue in proposition 1, *supra,* and in his claim counsel was ineffective, proposition 12, *infra.*

Accordingly, we find no merit to this proposition.

### III. JURY SELECTION ISSUES

For his seventh proposition, Appellant claims he was denied his right to a fair and impartial jury because the trial court improperly excused potential jurors who expressed reservations about the death penalty but said they could follow the court's instructions.

■ This Court has held a party need not prove a juror's bias against the death penalty with "unmistakable clarity." *Cooper v. State,* 889 P.2d 293, 306 (Okl.Cr.1995), *cert. granted on other grounds,* — U.S. —, 116 S.Ct. 282, 133 L.Ed.2d 202 (1995). This is so because "determination of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism." *Id.* (quoting *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985)). The appropriate concern is whether a juror can consider imposing the death sentence as a punishment, should that punishment be appropriate. *Mayes v. State,* 887 P.2d 1288, 1297 (Okl.Cr. 1994), *cert. denied,* — U.S. —, 115 S.Ct. 1260, 131 L.Ed.2d 140 (1995).

■ Appellant first calls our attention to comments by Richard Lynn Knight. Mr. Knight unhesitatingly told the court he could impose a sentence of life or life without parole; however, when the court asked him if he could "give meaningful consideration" to the death penalty, he replied "I don't know if I could do that." The court then explained death was a punishment option, adding that if a juror could "under no circumstances" consider all options, he could not serve on the jury. The following exchange then occurred

> COURT: So I'm asking whether you could give meaningful consideration to each of those possible punishments and—including death by lethal injection—and agree to a verdict of death if that in your opinion was justified.
>
> KNIGHT: No, sir, not death.
>
> COURT: Could you—if you found beyond a reasonable doubt that the defendant was

guilty of Murder in the First Degree, and if the law would permit you to consider a death—a sentence of death, do you have such reservations about the death penalty that, regardless of the law, regardless of the facts and circumstances, you could not consider a verdict fixing death?

KNIGHT: No sir.

COURT: State may inquire if you wish.

MR. MACY: State would move he be excused, Your Honor.

COURT: Defendant may inquire if you wish.

MR. GASSAWAY: I have no questions.

COURT: I must reluctantly excuse you, Mr. Knight. Please return to the jury assembly room for further assignment.

From this, it is clear that under no circumstances could Knight follow the law and consider the death penalty as a punishment, even if the circumstances warranted it. There is no error here.

■ He next complains the court improperly excused Theresa Rochelle Hardeman. The court asked the same questions of Ms. Hardeman, and she gave the same answers as to punishments of life and life without parole. However, when the court asked her if she could give the death penalty, she responded "No, sir, I couldn't." When asked if her reservations about the death penalty would prohibit her from considering it, she said "I just don't believe in the death penalty." The court then asked her "[a]re your reservations such that no matter what the evidence turns up to be here, no matter the circumstances, you could not under any circumstance consider, not that you'd have to necessarily reach that verdict, but consider, meaningfully consider death by lethal injection?" Ms. Hardeman again replied "[n]o, sir." At that point, the prosecution moved she be excused. Defense counsel asked her if she could think of a fact situation so horrible that she could say a defendant deserved the death penalty; she replied she could. Defense counsel then gave as an example "[l]ike if a guy had five babies and he killed them all and tortured them and burned their bodies to hide the evidence and he did it just to be mean," asking her if she could give it in that circumstance. She replied yes.

When the court pointed out her answers were inconsistent, she gave equivocal answers. After being pressed, she answered no to whether she "could not, will not under any circumstances, consider the death penalty in this case," adding "I couldn't give the death penalty."

This excusal was not error.

■ The last example Appellant cites occurred during questioning of prospective juror Prentice A. Hunt. He, too, did not hesitate in stating he could give either life or life without parole. When asked about the death penalty, he said he "would be a little hesitant," adding the prosecution "would have prove to me without a shadow—I mean, they would have to go to the extreme to prove to me that he would deserve that, you know." After explaining the penalty stage, the court again asked him if he could choose a punishment which was applicable, he replied he thought he could, but added "[w]ith all honesty I don't think I could convict him to death, to be honest." The juror said he had not made up his mind as to any issues in the case, but when it came to the death penalty, "[i]t's like I couldn't be comfortable with it is more of the term of it." The court opined he hoped no one would be comfortable in assessing that punishment, asking him if he could give "meaningful consideration to the death penalty, along with the other two possible punishments." Mr. Hunt replied: "[c]onsidering the way I was brought up, that's a horror for me." He explained his parents taught him "a wrong for a wrong don't make a right," and Appellant's death would not "bring the other person back." He finally agreed imposition of the death penalty would violate his conscience, that he did not "believe in death really, taking someone's life." After being pressed more, he said he "couldn't go with the death penalty.... I couldn't do it, Your Honor. Sorry, but I couldn't, to be honest." When defense counsel gave him the same hypothetical as Ms. Hardeman had been given, he said he might be able to give it. After more questioning by the court, Mr. Hunt essentially stated he could not guarantee he would follow the law if the death penalty were involved.

This instance is closer than the other two. Still, it is obvious "the trial judge [was] left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." *Cooper,* 889 P.2d at 306. That is why this Court typically gives deference to the trial judge "who sees and hears the juror." *Id.* We see no abuse of discretion here. Accordingly, we find no error, and this proposition is without merit.

## IV. FIRST–STAGE TRIAL ISSUES

### A.

During trial, the prosecution presented photographs of Richard and Sharon Paisley as they were found in the house. Appellant in his third proposition of error claims the photographs were unduly gruesome and unnecessary, as he never disputed the identity of the victims or the cause of death.

 This Court has held photographs are admissible if their content is relevant, unless their probative value is substantially outweighed by their prejudicial effect. *McGregor v. State,* 885 P.2d 1366, 1378–79 (Okl.Cr.1994), *cert. denied,* — U.S. —, 116 S.Ct. 95, 133 L.Ed.2d 50, (1995); *Bryson v. State,* 876 P.2d 240, 258 (Okl.Cr.1994), *cert. denied,* — U.S. —, 115 S.Ct. 752, 130 L.Ed.2d 651 (1995); *Smith v. State,* 737 P.2d 1206, 1210 (Okl.Cr.1987), *cert. denied,* 484 U.S. 959, 108 S.Ct. 358, 98 L.Ed.2d 383 (1988). The fact that the pictures are gruesome does not of itself cause the photographs to be inadmissible. The probative value of photographs of murder victims can be manifested in numerous ways including showing the nature, extent, and location of wounds, depicting the crime scene, and corroborating the medical examiner's testimony. *Bryson,* 876 P.2d at 258; *Fritz v. State,* 811 P.2d 1353, 1364–65 (Okl.Cr.1991).

 The photographs are relevant: they accurately depict the positions of the bodies as they were found, which corroborate the testimony of eyewitness Jackson; and tend to support the testimony of informant Jones. They also showed the nature and extent of the wounds, which corroborated the medical examiner's testimony. This Court will not disturb the evidentiary rulings of the trial court on appeal absent an abuse of discretion. *Cf. McGregor,* 885 P.2d at 1378–79 (Introduction of photographs of the victim's decomposed or dismembered remains depicting primarily bones and clothing strewn over grass and leaves not error); *Bryson,* 876 P.2d at 258 (Introduction of "admittedly gruesome" eight-by-ten color photographs of the victim's charred body introduced during the second stage of trial admissible; they were "a direct result of Appellant's actions" and supported the medical examiner's testimony the victim was still alive when he was set on fire.); *Fritz,* 811 P.2d at 1365 (Photographs admitted were black-and-white or color photographs of the crime scene and the victim as discovered at the scene; color Polaroid photos taken by the medical examiner at the beginning of the autopsy illustrating a different area of the victim's body and the marks and wounds on it admissible, as they corroborate the medical examiner's testimony and illustrate the wounds received by the victim). As we have said before, "[g]ruesome crimes result in gruesome pictures". *Mayes,* 887 P.2d at 1313 (quoting *McCormick v. State,* 845 P.2d 896, 898 (Okl.Cr.1993)). The only consideration to be made is whether the pictures are unnecessarily hideous, such that the impact on the jury can be said to be unfair. *McCormick,* 845 P.2d at 898–99. Here, as there, the photographs "were not so repulsive as to be inadmissible." *Id.* at 899 (quoting *Thomas v. State,* 811 P.2d 1337, 1345 (Okl.Cr.1991), *cert. denied,* 502 U.S. 1041, 112 S.Ct. 895, 116 L.Ed.2d 798 (1992)).

This proposition is without merit.

### B.

After his arrest, Appellant was taken to the police station, where he was interrogated twice. The second time, after being read his *Miranda* [8] rights, he readily agreed to talk, at which time he told the officers he was merely present and witnessed Todd Williams shoot both victims. However, during the

---

8. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) stated a suspect need not be subjected to police custodial interrogation without his consent.

first interview, he initially indicated he did not wish to talk with the officers.[9] After a brief discussion concerning the nature of the interview, he denied any knowledge of the crime. He now claims he did not knowingly and intelligently waive his right to remain silent under the Fifth Amendment to the Constitution of the United States.

Appellant does not contend—as he cannot—that he invoked his right to counsel after being advised of his *Miranda* rights; he contends authorities continued their questioning after he told them he did not wish to speak. Accordingly, we need not address the situation where a suspect requested counsel. *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); *see also Valdez v. State*, 900 P.2d 363 (Okl.Cr.), *cert. denied*, —— U.S. ——, 116 S.Ct. 425, 133 L.Ed.2d 341 (1995); *LaFevers v. State*, 897 P.2d 292, 299 (Okl.Cr.1995); *Mitchell v. State*, 884 P.2d 1186, 1193 (Okl.Cr.1994), *cert. denied*, —— U.S. ——, 116 S.Ct. 95, 133 L.Ed.2d 50 (1995).

We begin with the observation "full comprehension of the rights to remain silent and request an attorney [is] sufficient to dispel whatever coercion is inherent in the interrogation process." *Davis v. United States*, 514 U.S. ——, ——, 114 S.Ct. 2350, 2356, 129 L.Ed.2d 362, 372 (1994) (quoting *Moran v. Burbine*, 475 U.S. 412, 427, 106 S.Ct. 1135, 1144, 89 L.Ed.2d 410 (1986)). This Court has held when a defendant "has been fully advised of his constitutional rights and it appears that he has understood those rights, it can be assumed that any incriminating statements he makes thereafter constitute a waiver." *Rosteck v. State*, 749 P.2d 556, 558 (Okl.Cr.1988).

Here, the detective testified Appellant's answer to his question was equivocal, and he continued the conversation to ascertain whether Appellant intended to invoke his right to remain silent. After a review of the videotape,[10] we agree. The tape shows that after being advised of his *Miranda* rights, the officers asked Appellant if he wished to talk to them. Rather than give a vocal expression of his intentions, he merely shook his head. That led to the following conversation:

[police detective] EASLEY: Pardon me?

CARGLE: Huh-uh.

EASLEY: OK, you don't want to talk to us?

CARGLE: [without pausing] You guys gonna tell me what this is about?

[police detective] MITCHELL: Yeah, but you need to understand he just read you your rights, OK?

CARGLE: Uh-huh.

MITCHELL: And we've got certain directions that are given to us by the Supreme Court. OK? We would love to sit here, and I have no problem telling you what this is about. At all. OK? But for us to continue the court says we have to ask these questions, and that you have to be in agreement and it has to be your choice and it can't by anything that's forced upon you or, or tricked upon you or anything else, we don't work like that. So, you know, that's the question that's on the floor right now, is if you wish to talk to us. It's your choice. We'll be more than happy to explain to you what case this is and what all we're talking about. But it's your choice. You have—you have to decide whether you want to sit here and talk to us or not. OK?

CARGLE: All right.

MITCHELL: All right what?

CARGLE: I'll talk to you.

9. "No" is the word Det. Ron Mitchell initially used to describe Appellant's attitude during the hearing held to determine the voluntariness of Appellant's statements. During the hearing, Mitchell ultimately explained he was uncertain what Appellant's negative response concerned. He testified that because he was uncertain what Appellant's wishes were, he continued to talk to him to clarify those wishes. As the subsequent discussion shows, it is evident Appellant said "no," not because he did not wish to talk, but because he did not know why he was at the police station. Once that was explained, he readily indicated his willingness to discuss the case.

10. The videotape of this first interview was not played for the jury. However, it was made a part of the record on appeal, and we use it to help determine the issue before us.

MITCHELL: Are you sure? I mean, it's your choice, your decision that's your making, is that correct?

CARGLE: As long as I can find out—

MITCHELL: Sure—

CARGLE:—what's going—

MITCHELL:—Oh, I don't have a problem if that's all your hangup is, is you want to know what this is about, I don't have a problem with that. It's just, you know, just so that you don't feel that you're being tricked or that we've threatened you—we haven't threatened you in any way. We haven't said that much to you, right?

CARGLE: Uh-huh.

MITCHELL: OK, but it has to be your choice that you do want to continue. All right? And as he said whenever he was giving your rights if that at any point you decide you don't want to talk, you know, you don't have to.

CARGLE: How—

MITCHELL: Just to continue, we have to do that, and we have to do what the court says.

CARGLE: How long you guys gonna hold me?

MITCHELL: How long? Well, this is going to be thoroughly investigated. OK? This is gonna—this is gonna depend entirely on what you're gonna be able to tell us truthfully what happened. All right? You know a lot. We know that. You know a heck of a lot. Uh, the question—

CARGLE: About myself.

MITCHELL: Yeah, about yourself and about your involvement and about Todd's involvement and all of that. OK? And that's what it's gonna depend on is just how cooperative and how helpful you're gonna be. If your question is are you gonna get out tonight, no, no I don't think you will. In fact, I'm sure you won't.

CARGLE: Well—

MITCHELL: I mean, we've got too many questions that are being answered as we go on. That's the whole purpose of the investigation, is to start to piece together what took place. OK? And you're the one that can tell us your side. Todd is the one

that can tell Todd's side if he chooses. Unfortunately, the victims—

CARGLE: Todd?

MITCHELL: Uh-huh. Yeah. You don't know who Todd is?

CARGLE: I know Todd. He—he supposed to be in this?

MITCHELL: Yeah, he's supposed to be in this, too.

CARGLE: Well, I'm ready.

MITCHELL: Huh?

CARGLE: I'm ready.

Following this exchange, Det. Easley informed Appellant how they obtained the warrant for his arrest, and questioning began. During this conversation, Appellant denied all knowledge of the crime.

■ After reviewing the evidence, we hold Appellant's initial actions did not indicate a desire to remain silent, but rather indicated a desire to ascertain what course of action the officers were going to be taking, and how that course of action would affect him. This was merely one factor in the totality of the circumstances surrounding the determination Appellant knowingly and voluntarily waived his right to remain silent. *See Pickens v. State,* 850 P.2d 328, 334 (Okl. Cr.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 942, 127 L.Ed.2d 232 (1994); *Sadler v. State,* 846 P.2d 377, 384 (Okl.Cr.1993).

In light of this holding Appellant's waiver was knowing and intelligent, we need not address Appellant's "fruit-of-the-poisonous-tree" argument concerning the second conversation, during which he admitted being present at the scene at the time of the murders, but denied taking part. For the same reason, we need not address Appellant's contention the testimony of Christopher Jackson must be suppressed.

This fourth proposition of error is without merit.

### C.

■ For his fifth proposition of error, Appellant contends his conviction for the murder of Richard Paisley must be reversed because there is insufficient evidence to convict him of the crime. Appellant correctly

cites the test for determining the sufficiency of the evidence: whether, in reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt. *Spuehler v. State*, 709 P.2d 202, 203–04 (Okl. Cr.1985).

We begin where police began: with the evidence produced by Luke Jones. Before being jailed, Jones lived with Appellant and his family. Sometime the first part of October, Appellant asked Jones "if God would forgive him for murder." After being assured by Jones God would do so, Appellant told him he was "going through some changes" with himself because he had murdered "a man and a woman" "out there on Spencer." He told Jones someone named "Todd" had shot the man "and he had shot the woman" over "some bad weed deal." He then told Jones after they got their money back, Todd shot the man with a Tech–9 semiautomatic pistol, and when the woman moved, he shot her with a .22 pistol.

After authorities obtained an arrest warrant for Appellant and served it on him, Appellant was being taken to a police car. While being escorted out, Appellant asked the patrolman accompanying him "which murders is this about." The patrolman testified he said "[m]urders, more than one."

The strongest evidence against Appellant was given by Christopher Todd Jackson. Jackson said he encountered Appellant and Todd Williams, and asked them for a ride. They agreed, but Appellant told Jackson they had to make a stop first and get his money. They all arrived at the Paisleys' house and went inside. While Jackson accepted the offer of a beer[11], Appellant and Williams went with Richard to another room. When they came back out, Richard said he did not want any trouble and would be right back. Richard went to a neighbor's, where he borrowed money and returned, giving Appellant a $100 bill and telling him not to worry about it, he would get his money back. Jackson started for the door, and Appellant

announced he was coming, too. At that time, Williams came out of the back carrying the Tech–9 pistol and shot Richard in the chest, then the neck. By the second shot, Sharon had left her seat on the couch and was on the floor. Seeing this (after Williams fired his second shot at Richard), Appellant said "damn," jumped up from where he was seated, ran to where she was, and fired a .22 pistol at her. After the first shot, the weapon jammed. Williams shot Richard a third time as Richard crawled toward his bedroom. By that time, Appellant had unjammed his pistol and fired a second shot into Sharon's head.

Appellant contends this evidence does not show Appellant aided, assisted, abetted or encouraged Richard's shooting. In light of this and other evidence presented, we disagree. That Appellant was concerned with the "murders" instead of one "murder" indicated he believed he was culpable for both. Additionally, Appellant claimed he and Williams went to the Paisleys' house to get a refund for some bad marijuana; despite this, there is no evidence they returned the defective product, or even had it with them. However, both had loaded guns. The State contends on appeal, and we agree, Appellant seemed concerned, not because Williams went to the Paisleys' bathroom, but because he took too long in there, as if he were expecting something to happen.

There is also the evidence of a third gun: photographs clearly show a loaded .22 pistol was in a box on the floor between the coffee table and the couch where Sharon was sitting. The photos show Sharon's hand in the box, inches away from the weapon. Therefore, in the light most favorable to the prosecution, Appellant could have seen Sharon reach for the weapon in an attempt to save her husband, and took action to see she was not successful. Even if Appellant did not see what Sharon was reaching for, he would have been able to see her actions and take steps to ensure she did not interfere with Williams' shooting of Richard.

---

11. Appellant contends Jackson was an accomplice. We find no evidence to support this theory. Even Appellant did not implicate Jackson in the murders, although he had the opportunity to do so.

Taken in the light most favorable to the prosecution, *Spuehler,* 709 P.2d at 203–04, we find there is sufficient evidence from which any rational trier of fact could find beyond a reasonable doubt Appellant participated in Richard Paisley's murder. This proposition is without merit.

### D.

For his sixth proposition of error, Appellant claims the prosecution improperly vouched for the credibility of Christopher Todd Jackson. Jackson, the eyewitness to the crimes, testified under an immunity agreement, which the prosecution admitted into evidence. Appellant claims this admission, as well as comments in closing argument, constituted error.

■ We first observe defense counsel failed to object to the prosecutor's comments, thus waiving all but plain error. *Mayes,* 887 P.2d at 1321; *Moore v. State,* 788 P.2d 387, 398 (Okl.Cr.), *cert. denied,* 498 U.S. 881, 111 S.Ct. 227, 112 L.Ed.2d 182 (1990). We find no error here.

■ "Argument or evidence is impermissible vouching only if the jury could reasonably believe that the prosecutor is indicating a personal belief in the witness' credibility, either through explicit personal assurances of the witness' veracity or by implicitly indicating that information not presented to the jury supports the witness' testimony." *Nickell v. State,* 885 P.2d 670, 673 (Okl.Cr.1994) (quoting *Freeman v. State,* 876 P.2d 283, 288 (Okl.Cr.), *cert. denied,* —— U.S. ——, 115 S.Ct. 590, 130 L.Ed.2d 503 (1994)). We have reviewed the comments cited by Appellant in support of his complaint. The first merely restates the provisions of the agreement; the second and third statements focus not on whether Jackson was being truthful, but stress the agreement would have been void had he participated in the murders. We find the statements by the prosecutors to be permissible comments on the evidence presented, not improper vouching. *Romano v. State,* 847 P.2d 368, 380 (Okl.Cr.1993), *aff'd,* 512 U.S. ——, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994); *Clayton v. State,* 840 P.2d 18, 29 (Okl.Cr.1992), *cert. denied,* 507 U.S. 1008, 113 S.Ct. 1655, 123 L.Ed.2d 275 (1993).

Appellant also claims introduction of the agreement itself into evidence was error. Defense counsel did not object to the admissibility of the immunity agreement, and has therefore waived all but plain error. *Simpson v. State,* 876 P.2d 690, 693 (Okl.Cr. 1994). We find no error here.

■ As we said in *Nickell,* "[u]se of the 'truthfulness' portions of these [plea] agreements becomes impermissible vouching only when the prosecutors explicitly or implicitly indicate that they can monitor and accurately verify the truthfulness of the witness' testimony." *Id.* 885 P.2d at 673 (quoting *United States v. Bowie,* 892 F.2d 1494, 1498 (10th Cir.1990)). There is no improper vouching if the testimony does "no more than reveal that the witnesses had an obligation to testify truthfully and explain the consequences of a breach of that obligation." *Id.*

■ Here, the agreement states Jackson understood his immunity was based on the claim he was not a principal in the murders. It also states that should evidence to the contrary "become known," the agreement will become void. He also agreed to subject himself to scientific testing to reassure law enforcement officers the information he gave was correct; it also stated Jackson understood his information "must be capable of being corroborated by independent evidence." He also agreed to give fingerprint and palm prints to police.

■ The agreement in this case does not constitute impermissible vouching. Although the agreement said Jackson's information must be "capable" of being corroborated independently, it does not state authorities have done so or would be able to do so. Taken as a whole, we interpret this as a statement that should authorities obtain evidence implicating Jackson in the future, the agreement would be void.

Even if this were error, we have held that in the absence of an objection it is harmless "unless it had a 'substantial influence' on the outcome, or leaves the reviewing court in

'grave doubt' as to whether it had such an effect." *Simpson*, 876 P.2d at 702. As we have no "grave doubts" here, we find nothing indicating reversal is warranted. This proposition is without merit.

## V. SECOND–STAGE TRIAL ISSUES

### A.

■ In his eighth proposition of error, Appellant complains of two improper comments by prosecutors during second-stage closing argument. There was no objection to the first comment; and we find no plain, reversible error to the comment, when the prosecutor argued Appellant was a continuing threat to society and asked the jury to do justice. *Allen*, 871 P.2d at 96.

■ In the second comment, which drew an objection, the prosecutor said he knew he was asking a lot of the jurors, and their job was going to be hard. He then commented he had to make the decision to seek the death penalty, then present evidence to show it was deserved. He added the officers had to present evidence to him before he could make that decision; and that everyone had fulfilled their duties to get as far as the case had progressed. He then said Appellant was a volunteer in the process because he had initiated the act. He repeated the jury's job was hard, but "[o]nly the 12 of you can finish

the job by going up in that jury room and bringing back a verdict of death. Unless you do that, the efforts of the police department and my office have all been in vain." Appellant objected to the comment on the basis of societal alarm. We find no societal alarm present here, and do not otherwise review it except for plain error. *Simpson*, 876 P.2d at 703; *Tyler v. State*, 777 P.2d 1352, 1355 (1989). We find no plain error in acknowledging to the jury the difficulty of their task and asking them seriously to consider the punishment options available.

Accordingly, this proposition is also without merit.

### B.

In his ninth assignment of error, Appellant claims the broad, unlimited use of victim impact evidence in his case violated the Eighth Amendment to the United States Constitution because the prosecution was allowed to present highly emotional, irrelevant evidence to the jury.

The prosecution presented two witnesses who testified as to the impact of the victims' death. Of the two, the most emotional presentation came from Nancy Davis, Richard Paisley's sister, who read a prepared statement detailing the life of Richard from childhood until his death.[12] Sharon's mother,

12. The prepared statement, interrupted only once, covered 12 pages of transcript. Ms. Davis, several years older than Richard, began with an anecdote from Richard's life at age four (he was 33 at the time of his death). She related the following: "On coming home and finding my mother crying and unwilling to share her sorrow with me, Dick went over to her, placed his little arms around her and said, don't cry, mommy, I'm here with you. That's all it took. Dick was sensitive, Dick was loving." She also related that as a child, Richard collected fishing worms for local fishermen; he excelled in sports, and was the pitcher and captain of his baseball teams. She recalled a beach vacation they shared when Richard was eight. He got sunburned, and when Ms. Davis expressed concern, "Dick replied, I'll tell them it doesn't hurt and that's what you're supposed to get at the beach. He never complained. He made lemonade out of lemons." At that point, she identified a picture showing a proud Richard with a torch he carved out of wood for the Special Olympics for State Youth Services. The picture shows Richard by the carving, which displays a blue ribbon

he won for the art work. She also identified other pictures depicting carvings Richard did. Defense counsel objected to one picture of Richard, as the witness had written the dates of his birth and his death on the back. After this interruption, Ms. Davis continued with her written statement, relating that during a financially hard time, Richard lived in a tent on the college campus to save money for college, adding: "He asked for nothing. He would give you the shirt off his back." The entire family was proud of him when he graduated with his degree in parks and recreation and business administration; and the family became even closer after their parents died. He took control of a local park and made a success of it. She also related how he personally raised $15,000 for a fireworks display in 1984, rather than spend county money on it; the display "is still talked about today." She recounted how Richard rose through the ranks of the state park system, but yearned to be an artist instead. "Before departing for Oklahoma [abandoning his parks career for an art career], Dick told his beloved family, quote, 'You've got to have a dream, believe in yourself, and really enjoy

Shirley Howell, testified about Sharon.[13]

### 1.

Appellant acknowledges that the Supreme Court in *Payne v. Tennessee*, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), overruled prior decisions by holding the Eighth Amendment does not bar the states from allowing admission of victim impact evidence and prosecutorial argument on that evidence.

what you're doing. If not, you're only existing and have no real meaning in life.' " He came to Oklahoma to learn of southwestern art and became a successful wood carver.

The weekend of September 24, 1993, was to be his last, as he was planning to move back home. She recounted how her last contact was August 8, when she received a thank-you card with a letter

> for his 33rd birthday remembrance, to which he affixed this guardian angel [indicating]. That was typical of Dick. He was so happy to be coming home. We couldn't wait. Dick was our light. That light went out the afternoon of 27 September 1993, when we were notified of his and Sharon's tragic deaths. As word spread through family members, friends, co-workers, and acquaintances—and many are still learning about this and contacting us—there was disbelief, denial, anger, outrage, bitterness, sadness, and sheer heartache nothing can heal. We didn't even have the chance to say goodbye. What it meant to lose them no one will ever know. No one can pretend to know exactly how we feel. In order to know the devastation, pain and suffering, you would have to experience the same things yourselves. We hope you never do.

She eulogized him as a good kid and adult, who was encouraging to teammates. She related how a former boss shared a story from 1991, when

> Dick told him not to buy a Christmas tree, that he would bring him a special one from a tree lot he was managing as a second job. With rosy cheeks, Santa—Dick—showed up outfitted in a full Santa Claus suit to deliver the tree and a bag full of toys for his little boy. That was a special Christmas for Phil Gain's son. Dick planned to do it every year. He was our Santa, his last Christmas with us. Christmas will never be the same.

Another friend remembered him for his "spunk and the sparkle in his eyes." Another friend remembered how he also taught several outdoor programs to girl scout troops. Yet another imagined his presence "as that of a glorious rainbow brightening a cloudy day." Ms. Davis concluded with the following:

> He made us laugh. We don't laugh much now. We need Dick. We want him back. We did not know the afternoon of September 27 what sorrow that day would bring. When we learned Dick's heart of gold had stopped beating, and we couldn't do a thing. Oh, how we loved to see Dick's smile, to be together in the same old way. There is never a day that Dick is not foremost on our minds. Our hearts still

ache with sadness, heartache nothing can heal, and the tears continue to flow. We're not the same without him. Everything is emptier now. Oh, we miss Dick so, and we want him back. Though his smile is gone forever and his hands we can not touch, we have precious memories of Dick, the one we love so much. We knew a family's joy when Dick was born and felt the love and pride grow as he grew to manhood. Our joy and thankfulness for having had him as a wonderful brother and love for him and pride still remain forever besides the horrendous pain and suffering that knows no end. We want justice for him and Sharon. There must be justice. They say that time heals all sorrows and helps you to forget, but time so far has only proved how much we miss Dick yet. Sadly missed by Barbara, Earl, Nancy, Buck, Ed, Jeannette, Terry, Donna, Harold, Rita, Shirley and Ed Howell, and families, and Dick's many, many friends throughout this country who loved him so. That none of you will ever have to lose someone so near and dear to you in such a senseless way as this is the Paisley's prayer for you. God bless you.

Defense counsel did not cross examine.

13. She testified how much Sharon loved animals, always finding strays and bringing them home, taking care of them, and even taking them to the vet. Sharon was described as "one of the most alive people I've ever known. There was just something about her. She—she just sparkled, and there was a brightness about her. She was our sunshine." Ms. Howell noted Sharon made the best of every situation. She said the two always exchanged recipes, etc. She related how she mailed a box of chinkapins, nuts from North Carolina, to Sharon, "[b]ut she didn't ever get to open them." She also identified pictures of Richard and Sharon together, pictures of Sharon with her cat and one of Richard with his torch. She observed:

> "I can't tell you how much I love Sharon.... She—she was everything to me. She was my friend. We shared everything. And there's never a plan that I ever had that didn't include her. She was a wonderful, loving daughter, and we enjoyed being together so much. And we were so looking forward to her coming home. They were already packing and getting ready to come home, and we were already making plans about being able to spend some time together."

Her last contact was when Sharon called the Sunday before her death to wish her father a happy birthday. Again, defense counsel did not cross-examine.

However, he contends that without some guidelines, the evidence becomes nothing more than a "super aggravator" which negates the narrowing function death penalty procedures are required to provide. To fully address the issue, we find it necessary to review pertinent language in *Payne*.

In overruling *South Carolina v. Gathers*, 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989) and *Booth v. Maryland*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), the *Payne* Court allowed victim impact evidence as admissible evidence "designed to portray for the sentencing authority the actual harm caused by a particular crime," *Payne*, 501 U.S. at 821, 111 S.Ct. at 2606. Earlier cases requiring individualized consideration to the defendant did not require this type of evidence to be excluded, as "it was never held or even suggested in any of our cases preceding *Booth* that the defendant, entitled as he was to individualized consideration, was to receive that consideration wholly apart from the crime which he had committed." *Id.* 501 U.S. at 822, 111 S.Ct. at 2607. By equating evidence which must be received (mitigating evidence on behalf of the defendant) with evidence which may be received (victim impact evidence), the *Booth* and *Gathers* Courts "unfairly weighted the scales in a capital trial; while virtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances, the State is barred from either offering 'a glimpse of the life' which a defendant 'chose to extinguish,' or demonstrating the loss to the victim's family and to society which have resulted from the defendant's homicide." *Payne*, 501 U.S. at 822, 111 S.Ct. at 2607 (citation omitted).

In other words, victim impact evidence is permissible because "the State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family." *Payne*, 501 U.S. at 825, 111 S.Ct. at 2608 (citation omitted).

## 2.

But the ability to present victim impact evidence does not, as Appellant suggests, mean the "floodgates have opened" and that everything the prosecution wishes is admissible. While the rules of evidence are not to be applied in a mechanistic fashion in the sentencing stage of a capital case, they nonetheless do apply. *See Fox v. State*, 779 P.2d 562, 572 (Okl.Cr.1989), *cert. denied*, 494 U.S. 1060, 110 S.Ct. 1538, 108 L.Ed.2d 777 (1990); *Bromley v. State*, 757 P.2d 382, 386 (Okl.Cr.1988); *Castro v. State*, 745 P.2d 394, 407 (Okl.Cr.1987). We must be cognizant of the fact that, although it does not violate the Eighth Amendment, evidence may be introduced "that is so unduly prejudicial that it renders the trial fundamentally unfair," thus implicating the Due Process Clause of the Fourteenth Amendment. *Payne*, 501 U.S. at 825, 111 S.Ct. at 2608. Therefore, the trial court was incorrect when he stated the statute authorizing victim impact evidence does not "narrowly define it, confine it." The evidence must be not only relevant, but subject to the balancing provisions of 12 O.S. 1991, § 2403. This in and of itself more narrowly defines the victim impact evidence which a jury may hear.

However, we believe § 2403 is not the ending place, but the starting point. The underlying principles in *Payne* seem to indicate more scrutiny is needed. As noted above, the Court seemed to require a balancing to keep the scales of a capital trial from being "unfairly weighted" in favor of one side or the other. *Payne*, 501 U.S. at 822, 111 S.Ct. at 2606–07; *see also Id.*, 501 U.S. at 826, 111 S.Ct. at 2609 ("[T]here is nothing unfair about allowing the jury to bear in mind that harm at the same time as it considers the mitigating evidence introduced by the defendant. . . . It is an affront to the civilized members of the human race to say that at sentencing in a capital case, a parade of witnesses may praise the background, character and good deeds of Defendant (as was done in this case), without limitation as to relevancy, but nothing may be said that bears upon the character of, or the harm imposed, upon the victims.") (citation omitted); *Id.* 501 U.S. at 827, 111 S.Ct. at 2609

("[J]ustice, though due to the accused, is due to the accuser also. The concept of fairness must not be strained till it is narrowed to a filament. We are to keep the balance true.") (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 122, 54 S.Ct. 330, 338, 78 L.Ed. 674 (1934)); *see also Petition of State of Delaware*, 597 A.2d 1 (Del.1991); *State v. Wise*, 879 S.W.2d 494 (Mo.1994); *McNelton v. State*, 111 Nev. 900, 900 P.2d 934, 938 (1995) (quoting *Homick v. State*, 108 Nev. 127, 137, 825 P.2d 600, 606 (1992)) ("The key to criminal sentencing in capital cases is the ability of the sentencer to focus upon and consider both the individual characteristics of the defendant and the nature and impact of the crime he committed. Only then can the sentencer truly weigh the evidence before it and determine a defendant's just deserts."); *State v. Rocheville*, 310 S.C. 20, 425 S.E.2d 32 (1993).

### 3.

■ This case is an example of victim impact evidence coming perilously close to weighting the scales too far the other way. In the face of the highly emotional statement by Ms. Davis, Appellant presented only his minister, who testified he used to have a close relationship with Appellant, who came from loving and caring people and who during the past few years "just kind of got apart" from his parents and the church.

We realize the difficult situation in which a trial court is placed: in most situations, the trial court must determine whether victim impact evidence presented by the prosecution is admissible even before the Court knows whether a defendant will present any appreciable amount of mitigating evidence. But we are also aware it is not the amount of evidence which is presented, but the opportunity for each side to present evidence which the *Payne* Court addressed; indeed, the *Payne* Court made it clear it would leave to the states the details on how to devise procedures and remedies to address the problem. *Payne*, 501 U.S. at 824–25, 111 S.Ct. at 2607–08.

We find existing statutes, when properly utilized, contain sufficiently stringent guidelines outlining the use of victim impact evidence. Although the reference to victim impact evidence in Title 21 is not defined, there is a definition in Title 22:

> "Victim impact statements" means information about the financial, emotional, psychological, and physical effects of a violent crime on each victim and members of their immediate family, or person designated by the victim or by family members of the victim and includes information about the victim, circumstances surrounding the crime, the manner in which the crime was perpetrated, and the victim's opinion of a recommended sentence;

22 O.S.Supp.1993, § 984.[14] From this definition and the *Payne* opinion itself, we have arrived at the following guidelines.

14. We need not address the implications inherent in the last phrase of this definition, "and the victim's opinion of a recommended sentence" in this opinion, as the victim's relatives did not express an opinion as to the appropriate punishment. We would, however, refer the trial courts to language in both the *Payne* opinion itself and a concurring opinion which indicates such a recommendation may not pass scrutiny on appellate review. *See Id.*, 501 U.S. at 830 n 2, 111 S.Ct. at 2611 n. 2. ("Our holding today is limited to the holdings of [*Booth* and *Gathers* ], that evidence and argument relating to the victim and the impact of the victim's death on the victim's family are inadmissible at a capital sentencing hearing. *Booth* also held that the admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence violates the Eighth Amendment. No evidence of the latter sort was presented at the trial in this case."). This is also expressed in the concurring opinion of Justice O'Connor, joined by Justices White and Kennedy. *See Id.*, 501 U.S. at 833, 111 S.Ct. at 2612–13 ("*Booth* also addressed another kind of victim impact evidence—opinions of the victim's family about the crime, the defendant, and the appropriate sentence. As the Court notes in today's decision, we do not reach this issue as no evidence of this kind was introduced at petitioner's trial.... Nor do we express an opinion as to other aspects of the prosecutor's conduct. As to the victim impact evidence that was introduced, its admission did not violate the Constitution. Accordingly, I join the Court's opinion."). *See also State v. Bolton*, 182 Ariz. 290, 896 P.2d 830, 855 (1995) (although victim impact evidence admissible under Arizona law, it is improper for victim to express opinion of punishment); *State v. Fautenberry*, 72 Ohio St.3d 435, 438–40, 650 N.E.2d 878, 882 (1995) (opinion on punishment not permissible, but harmless error when sentence decided by three-judge panel).

■ The statutory language is clear the evidence should be restricted to the "financial, emotional, psychological, and physical effects," or impact, of the crime itself on the victim's survivors; as well as some personal characteristics of the victim. *See also Freeman,* 876 P.2d at 289. So long as these personal characteristics show how the loss of the victim will financially, emotionally, psychologically, or physically impact on those affected, it is relevant, as it gives the jury "a glimpse of the life" which a defendant "chose to extinguish," *Payne,* 501 U.S. at 822, 111 S.Ct. at 2607. However, these personal characteristics should constitute a "quick" glimpse, *see Payne,* 501 U.S. at 830, 111 S.Ct. at 2611 (O'Connor, J., with whom White and Kennedy, JJ., join, concurring), and its use should be limited to showing how the victim's death is affecting or might affect the victim's survivors, and why the victim should not have been killed. Mitigating evidence offers the factfinder a glimpse of why a defendant is unique and deserves to live; victim impact evidence should be restricted to those unique characteristics which define the individual who has died, the contemporaneous and prospective circumstances surrounding that death, and how those circumstances have financially, emotionally, psychologically, and physically impacted on members of the victim's immediate family.[15]

■ Consistent with our decision in *Mitchell v. State,* 884 P.2d 1186, 1204 (Okl. Cr.1994), the State should file a Notice of Intent to Produce Victim Impact Evidence, detailing the evidence sought to be introduced; and an in-camera hearing should be held by the Trial Court to determine the admissibility of the evidence as it relates to 12 O.S.1991, § 2403. This victim impact evidence should not be admitted until the trial court determines evidence of one or more aggravating circumstances is already present in the record. *See Windom v. State,* 656 So.2d 432, 438 (Fla.1995). Further, the evidence sought to be introduced should be limited to the evidence listed in the prosecutor's notice filed before trial. And, although we shall not require it, the trial court may wish to consider whether a question-and-answer format may be a preferable method of controlling the way relevant victim impact evidence is presented to a jury. *See State v. Gideon,* 257 Kan. 591, 894 P.2d 850, 864 (1995).

■ To further assist the jury in using victim impact evidence, we hereby promulgate the following instruction, to be used in all future capital murder cases in which victim impact evidence is presented:

The prosecution has introduced what is known as victim impact evidence. This evidence has been introduced to show the financial, emotional, psychological, or physical effects of the victim's death on the members of the victim's immediate family. It is intended to remind you as the sentencer that just as the defendant should be considered as an individual, so too the victim is an individual whose death may represent a unique loss to society and the family. This evidence is simply another method of informing you about the specific harm caused by the crime in question.

15. This disposes of Appellant's contention on appeal the victim impact evidence is a "super aggravator" which will always be present in a capital case. The answer lies in the obvious differences between victim impact evidence and aggravating circumstances. Evidence supporting an aggravating circumstance is designed to provide guidance to the jury in determining whether the defendant is eligible for the death penalty; victim impact evidence informs the jury why the victim should have lived. Even if victim impact evidence is present in every case, this does not relieve the prosecution of its burden to prove beyond a reasonable doubt the aggravating circumstance it has alleged. The two kinds of evidence are not similar: that a victim may have been a great person who will be missed by his friends and relatives does not go toward proving a defendant is a continuing threat to society, that the victim was killed so the defendant could avoid arrest or prosecution, that the victim suffered torture or serious physical abuse before he died, or any other aggravating circumstance the prosecution might allege. Because the jury's discretion still is narrowly channeled by the requirement they must find at least one aggravating circumstance beyond a reasonable doubt, the death penalty does not become overbroad, and Appellant's contention this is an Eighth Amendment violation fails. *See Windom v. State,* 656 So.2d 432, 438 (Fla.1995) (noting that Florida statute permitting victim impact evidence allows such evidence "only after there is present in the record evidence of one or more aggravating circumstances.")

You may consider this evidence in determining an appropriate punishment. However, your consideration must be limited to a moral inquiry into the culpability of the defendant, not an emotional response to the evidence.

As it relates to the death penalty: Victim impact evidence is not the same as an aggravating circumstance. Proof of an adverse impact on the victim's family is not proof of an aggravating circumstance. Introduction of this victim impact evidence in no way relieves the State of its burden to prove beyond a reasonable doubt at least one aggravating circumstance which has been alleged. You may consider this victim impact evidence in determining the appropriateness of the death penalty only if you first find that the existence of one or more aggravating circumstance has been proven beyond a reasonable doubt by evidence independent from the victim impact evidence, and find that the aggravating circumstance(s) found outweigh the finding of one or more mitigating circumstances.

As it relates to the other sentencing options: You may consider this victim impact evidence in determining the appropriate punishment as warranted under the law and facts in the case.

The instruction is to be used in all future capital murder trials where victim impact evidence has been introduced, and is effective from the date this opinion is published.[16]

These guidelines and this instruction, together with our power to modify or remand under Mandatory Sentence Review,[17] is sufficient to assure the jury's verdict of death is a "reasoned moral response" "based on reason and reliable evidence." *Payne,* 501 U.S. at 836, 111 S.Ct. at 2614 (citations omitted)

---

**16.** This instruction is tailored to Capital Murder trial procedure. However, the provisions of 22 O.S.Supp.1993, § 984 et seq., are not restricted to death penalty proceedings. Trial Courts should tailor victim impact evidence instructions to apply to the type of trial in which it is presented.

**17.** Specifically, 21 O.S.1991, § 701.13(C) provides:

With regard to the sentence, the court shall determine:

(Souter, J., with whom Kennedy, J joins, concurring).

With these guidelines in mind, we turn to the victim impact evidence presented at Appellant's trial.

### 4.

■ The evidence presented in this case exceeded the statutory framework of admissible evidence. The prosecutor himself seemed to acknowledge as much when, in discussing the evidence before the beginning of the second stage, told the court "[t]he women are going to be very emotional. The man probably will make more—we feel he can do a better job in explaining what the impact has been." The record before us does not reflect whether either Ms. Davis or Ms. Howell succumbed to their emotions during their testimony (at which point the trial court would have a duty to take appropriate action, *see Mitchell,* 884 P.2d at 1205); still, there can be no question the testimony was emotionally powerful, and from the standpoint of admissibility of victim impact evidence, much of it irrelevant. For instance, portraying Richard as a cute child at age four in no way provides insight into the contemporaneous and prospective circumstances surrounding his death; nor does it show how the circumstances surrounding his death have financially, emotionally, psychologically, and physically impacted on members of the victim's immediate family. Although Richard may have been unique in that he dressed up as Santa Claus, saved the county thousands of dollars by a personal fundraising effort, was a talented athlete and artist, and was thoughtful and considerate to his family, this goes to only one aspect of the factors enunciated in the statutory definition of victim impact statements. In fact, the

---

1. Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and

2. whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in Section 701.12 of this title.

Here, rather than the latter question, we are concerned with the former.

entire statement by Ms. Davis goes to the emotional impact of Richard's death. There is no explicit testimony as to the financial, psychological or physical effects of the crime on his family. Taken as a whole, the probative value of Ms. Davis's statement is substantially outweighed by its prejudicial effect. The testimony by Ms. Howell, although still emotionally charged, is not so inflammatory.

 In discussing this, we in no way hold the emotional impact of a victim's loss is irrelevant or inadmissible; we simply state that, in admitting evidence of emotional impact, especially to the exclusion of the other factors, a trial court runs a much greater risk of having its decision questioned on appeal. *Cf. Saffle v. Parks,* 494 U.S. 484, 493, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990) (Discussing anti-sympathy instruction: "It would be very difficult to reconcile a rule allowing the fate of a defendant to turn on the vagaries of particular jurors' emotional sensitivities with our longstanding recognition that, above all, capital sentencing must be reliable, accurate, and nonarbitrary."). The realities are, virtually everyone who is murdered is going to be missed by someone; and to that degree, is not unique from any other victim. The more a jury is exposed to the emotional aspects of a victim's death, the less likely their verdict will be a "reasoned moral response" to the question whether a defendant deserves to die; and the greater the risk a defendant will be deprived of Due Process.

 Appellant also complains the court allowed photographs of the victims while they were alive as a part of the victim impact evidence. This Court has held such photographs are generally inadmissible, again based on their relevancy to the issues presented at trial. *Staggs v. State,* 804 P.2d 456, 458 (Okl.Cr.1991); *Rawlings v. State,* 740 P.2d 153, 161 (Okl.Cr.1987) (although generally inadmissible, photograph of victim while alive relevant to further show appellant, who had photograph, committed murder). In light of the above discussion, we see no reason to retreat from that ruling. Here,

for example, while the photograph of Richard holding one of his art works may arguably be relevant to show his handiwork and "information about the victim", other photographs of other pieces of artwork rendered this particular photograph cumulative; and considering the fact his date of birth and date of death were written on the back of that particular photograph, its probative value was substantially outweighed by its prejudicial effect. The photograph of both Richard and Sharon was clearly irrelevant, as it in no way showed the financial, psychological or physical impact on their survivors or any particular information about the victim. The photograph did not demonstrate any "information about the victim" and it does not show how their deaths are affecting or might affect the survivors. Accordingly, it was error to admit the photographs here.

The consequences of this evidence are addressed more fully in the Mandatory Sentence Review, below.

### C.

In his tenth proposition, Appellant challenges several aggravating circumstances on both evidentiary and constitutional grounds.

### 1.

He first contends there was insufficient evidence to support the murders of Richard and Sharon Paisley were heinous, atrocious or cruel. We shall begin with Richard.

### a.

 Testimony is undisputed that Todd Williams approached Richard and first shot him in the chest.[18] After that shot, Richard stood up briefly before Williams pointed the weapon to the back of his head and pulled the trigger. Falling to the ground and shot twice, Richard managed to crawl toward his bedroom before Williams placed the weapon on or very near the back of his head and fired a third time. Based on this evidence in the light most favorable to the prosecution, a

---

**18.** The medical examiner testified she could not determine the order in which the three shots to Richard Paisley occurred. Here, that is not determinative, as the eyewitness, Christopher Todd Jackson, related the series of events. This series of events was corroborated by the statement Appellant gave to authorities.

reasonable factfinder could find beyond a reasonable doubt Richard Paisley's death was preceded by torture or serious physical abuse. *Cf. Hale v. State*, 750 P.2d 130, 143 (Okl.Cr.), *cert. denied*, 488 U.S. 878, 109 S.Ct. 195, 102 L.Ed.2d 164 (1988).

b.

 The question is not so easy as to Sharon Paisley. The medical examiner found one entry wound to her head. Despite evidence there may have been more than one shot through that wound—in addition to the eyewitness account stating Appellant shot Sharon twice, the police firearms examiner opined the amount of lead found was more than would be present had only one .22 caliber bullet been fired—there was no substantial evidence Sharon was conscious after the first shot was fired. In fact, the medical examiner testified although it was possible Sharon remained conscious after the shot, it was more likely she did not. Based on this evidence, we find no physical or mental suffering. *Stouffer v. State*, 742 P.2d 562, 564 (Okl.Cr.1987), *cert. denied*, 484 U.S. 1036, 108 S.Ct. 763, 98 L.Ed.2d 779 (1988). Accordingly, in the light most favorable to the prosecution, we find insufficient evidence to support the jury's finding the death of Sharon Paisley involved torture or serious physical abuse. The effect of this finding will be discussed in the mandatory sentence review, below.

2.

Appellant next contends the heinous, atrocious or cruel aggravating circumstance is unconstitutionally invalid. We addressed this argument in *Cooper*, 889 P.2d at 313–14. *See also Hatch v. Oklahoma*, 58 F.3d 1447, 1468–69 (10th Cir.1995). We see no need to address it again.

3.

 Appellant next contends there was insufficient evidence to prove he committed murder to avoid arrest or prosecution. The jury found this aggravating circumstance pertained to Sharon Paisley, but not to Richard Paisley.

The evidence shows that Williams came out of the back of the house and began shooting Richard Paisley. While Richard Paisley was being shot, Sharon Paisley dived to the floor from the couch on which she had been sitting. When she did so, Appellant approached Sharon and fired one shot into her head before his pistol jammed. After clearing the weapon, Appellant fired a second shot into Sharon's head.

Evidence was also introduced at trial that Appellant participated in the robbery of Janet Denson and her family. Although he threatened family members, he left without killing the potential witnesses, leaving them to identify him for prosecution of that crime; as a result, he was convicted of that robbery.

In the light most favorable to the prosecution, the evidence shows Appellant learned from his previous experience, and shot Sharon to keep her both from interfering with the murder of Richard and to eliminate a possible witness to Richard's murder. *See Romano v. State*, 847 P.2d 368, 387 (Okl.Cr.1993), *aff'd*, 512 U.S. ——, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994); *Williamson v. State*, 812 P.2d 384, 407 (Okl.Cr.1991), *cert. denied* 503 U.S. 973, 112 S.Ct. 1592, 118 L.Ed.2d 308 (1992), *reversed on other grounds*, 904 F.Supp. 1529, (E.D.Okl.1995).

4.

 Appellant next contends there was insufficient evidence to support the aggravating circumstance Appellant knowingly presented a great risk of death to more than one person. The evidence shows Appellant and Williams had been to the Paisley house earlier, when they purchased marijuana. When they returned, each had a weapon. When Appellant entered the house, he knew both Richard and Sharon were present. After Williams started shooting Richard Paisley, Appellant went to Sharon Paisley and shot her in the head twice. In addition to aiding and abetting in the death of Richard Paisley, Appellant deliberately murdered Sharon Paisley. The death of these two people supports the jury's finding Appellant knowingly created a great risk of death to more than one person. *Sellers v. State*, 809 P.2d 676, 691 (Okl.Cr.1991), *cert. denied*, 502 U.S. 912, 112 S.Ct. 310, 116 L.Ed.2d 252 (1991); *Fowl-*

*er v. State,* 779 P.2d 580, 588 (Okl.Cr.1989), *cert. denied,* 494 U.S. 1060, 110 S.Ct. 1537, 108 L.Ed.2d 775 (1990); *Stafford v. State,* 669 P.2d 285, 299 (Okl.Cr.1983), *vacated on other grounds,* 467 U.S. 1212, 104 S.Ct. 2652, 81 L.Ed.2d 359 (1984).

### 5.

Appellant also challenges the constitutionality of this aggravating circumstance. This, too, has been determined. *See Cartwright v. Maynard,* 802 F.2d 1203, 1221–22 (10th Cir. 1986), *reversed on other grounds,* 822 F.2d 1477 (1987), *aff'd,* 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988).

### 6.

Appellant next contends Oklahoma's "continuing threat" aggravating circumstance is unconstitutionally overbroad. Appellant acknowledges this, too, is well settled by *stare decisis. See Cooper,* 889 P.2d at 315; *Malone v. State,* 876 P.2d 707, 715–16 (Okl.Cr. 1994) and cases cited therein; *Snow v. State,* 876 P.2d 291, 298 (Okl.Cr.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1165, 130 L.Ed.2d 1120 (1995). He has given us no reason to change this rule of law.

For the reasons stated above, we find insufficient evidence to support the jury's finding the murder of Sharon Paisley was especially heinous, atrocious or cruel. Otherwise, Appellant's tenth proposition of error is without merit.

### VI. COMPETENCY OF COUNSEL

In his twelfth proposition, Appellant claims his counsel was ineffective. He claims counsel was ineffective because he failed to present timely motions for preliminary hearing transcript and a competency hearing; he failed to object to the introduction of highly prejudicial victim impact evidence at the sentencing hearing; and failed to prepare and present adequate mitigating evidence.

■ To prove ineffective assistance of counsel, Appellant must show not only that his attorney's performance fell below acceptable levels of professionalism, but also that this substandard performance had an effect on the outcome of the proceeding. Unless an appellant can show both, "it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *Williamson,* 812 P.2d at 411.

■ Concerning the failure to prepare and present more mitigating evidence, the fact a defense attorney could have done more investigation into a defendant's background for mitigating evidence alone does not establish ineffective assistance of counsel. *Dutton v. Brown,* 812 F.2d 593, 598 (10th Cir.), *cert. denied,* 484 U.S. 836, 108 S.Ct. 116, 98 L.Ed.2d 74 (1987); *Stafford,* 665 P.2d at 1213. This Court has held it will not second-guess trial strategy on appeal. *Williamson,* 812 P.2d at 412. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 413. Here, defense counsel indicated before the second stage began he would call Appellant's mother, father, preacher and a record producer. Before presenting evidence in mitigation, defense counsel called to the stand Victor Don Johnson, Appellant's natural father. Johnson told the court during an *in camera* hearing he had discussed with defense counsel the possibility of testifying, but decided he did not want to. When asked why, he responded: "Well, I don't believe Marcus—he makes no sense to me. Since this been going, he doesn't make no sense..... I choose not to testify. My wife is the same because why she didn't come back." Defense counsel then made an offer of proof. He told the court that if Appellant's parents testified, they would testify as to Appellant's date of birth; that he was raised by them and was always very mannerable as a child; that Rose was perhaps too strict on Appellant; that Appellant attended regular church services, and enjoyed playing the drums and guitar; that before the armed robbery, Appellant had planned on entering military service; and that communication problems had

developed between Appellant and his father, which hurt Appellant.

■ Appellant claims it was error not to put Appellant's parents on the stand. We disagree. In light of the father's remarks, it is very likely he would not have served the cause of his son well.[19] We will not second-guess defense counsel for what seems an appropriate course of action in not placing Appellant's parents on the stand. Because Appellant has failed to show his counsel's performance was deficient in this instance, we need not address whether their testimony would have changed the outcome of the sentencing portion of the trial.

■ In Appellant's claim counsel was ineffective for failing to prepare earlier a motion for determination of competency, we need not address whether counsel's performance was substandard, as Appellant can show no prejudice. We held in proposition 2, above, that the court did not err in overruling Appellant's motion because it did not state sufficient facts to raise a doubt as to Appellant's competency. Such a motion would be no more effective simply because it was filed at an earlier time.

■ The complaint dealing with the preliminary hearing transcript is more involved. We noted above that, based on the record before us, the court overruled the motion for a preliminary hearing transcript at State expense because Appellant's trial counsel failed to be present at the time set for hearing on the motion; accordingly, counsel failed to exercise due diligence in seeking the transcript, and the attorney's performance fell below acceptable levels of professionalism.

■ However, Appellant cannot show this substandard performance had an effect on the outcome of the proceeding. We have reviewed the testimony of all witnesses and compared that testimony to the testimony presented at trial. We find the testimony is strikingly consistent. Furthermore, defense counsel's cross-examination of the witnesses was spirited and thorough; on at least one occasion, defense counsel attempted to impeach a key witness by calling to his attention what testimony he presented at the preliminary hearing. Because Appellant cannot show the transcript would have been useful in impeaching testimony at trial, he cannot show prejudice, as "it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064; *Williamson*, 812 P.2d at 411.

We therefore find Appellant's trial counsel was not constitutionally ineffective. This proposition is without merit.

## VII. CUMULATIVE ERROR

■ For his thirteenth and last proposition, Appellant claims the accumulation of errors at his trial dictate reversal. We addressed the lack of a transcript (proposition 1) and the sufficiency of the evidence concerning the Richard Paisley murder (proposition 5) above. We found no error in the court's failing to order a competency examination (proposition 2); in allowing photographs of the victims (proposition 3); in admitting Appellant's statements into evidence (proposition 4); in allowing evidence of the prosecution agreement between Jackson and the district attorney's office (proposition 6); in excusing certain prospective jurors from the panel (proposition 7); no plain error in the comments made by the prosecutors in closing arguments (proposition 8); no error in use of the aggravating circumstances (proposition 10); and no incompetence of counsel (proposition 12).

19. Appellant's attorney has filed an application for leave to supplement the record on appeal in accordance with Rule 3.11 of this Court's rules. The application, submitted in connection with Appellant's contention his counsel was incompetent, deals with a proposed affidavit of Appellant's mother, who did not testify in the in-camera hearing. The application indicates the affidavit would state that, if Appellant's mother had been called to testify, she would have presented information about Appellant's childhood, his schooling, his learning disabilities and his medical difficulties. In light of the record made by Appellant's trial attorney (which states essentially the same things), we find no reason to grant the application, as we can determine from the record that, even if presented, this information would not have materially benefitted Appellant as to the jury's determination of sentence. Accordingly, the application to supplement the record on appeal is denied.

What remains is failure to transcribe certain pretrial motions (proposition 11) and error in admitting portions of the victim impact evidence (proposition 9). There can be no cumulative error from these two errors. As noted above, whether a pretrial motion was transcribed in no way affects the ability of the factfinder to determine guilt or punishment. Nor would it impact in any way upon the effect the victim impact evidence would have on the jury.

Accordingly, this proposition of error is without merit.

## VIII. MANDATORY SENTENCE REVIEW

This Court is required by 21 O.S.1991, Sec. 701.13(C) to determine whether (1) the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor, and (2) whether the evidence supports the jury's finding of aggravating circumstances as enumerated in 21 O.S.1981, Sec. 701.12. We shall address the second portion first.

As to the Richard Paisley murder, the jury found the following aggravators: Appellant was previously convicted of a felony involving the use or threat of violence to the person; Appellant knowingly created a great risk of death to more than one person; the murder was especially heinous, atrocious, or cruel; and there existed a probability that Appellant would commit criminal acts of violence that would constitute a continuing threat to society. The State alleged, but the jury did not find, that the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution.

We found in proposition 10, above, that the evidence supported the jury's finding the murder of Richard Paisley was heinous, atrocious or cruel. We also found above that Appellant created a great risk of death to more than one person.

█ Appellant does not contest the sufficiency of the evidence as it pertains to continuing threat, and we find it sufficient. The victim of a June 1991 burglary, Janet Denson, testified that at approximately 2:30 one morning she answered the doorbell to find herself staring down the barrel of a long-nosed revolver. The person wielding the pistol told her she was being robbed. After gaining entry and pressing the pistol to her head, the robber took her rings and ordered her on the floor while two others assisted in the robbery. When Ms. Denson's husband came down, he, too, was threatened with a firearm and told to lie on the floor. Ms. Denson thought she would be killed; however, one of the robbers told the one named "Mark" they had been spotted, they left after approximately 45 minutes, taking several of the Densons' possessions. She identified Appellant as the apparent leader of the robbers and the person who held the weapon to her head.

In addition to supporting the continuing threat aggravating circumstance, his conviction for that robbery supports the jury's finding he was previously convicted of a felony involving the use or threat of violence to the person.

Concerning the murder of Sharon Paisley, the jury found the following aggravators: Appellant was previously convicted of a felony involving the use or threat of violence to the person; Appellant knowingly created a great risk of death to more than one person; the murder was especially heinous, atrocious, or cruel; the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution; and there existed a probability the defendant would commit criminal acts of violence that would constitute a continuing threat to society. We found in proposition 10, above, that the evidence did not support the jury's finding the murder of Sharon Paisley was heinous, atrocious or cruel. We did find sufficient evidence to support the finding Appellant created a great risk of death to more than one person. We also found sufficient evidence to support the jury's finding Appellant killed Sharon Paisley to avoid arrest or prosecution. The same evidence as discussed in the Richard Paisley murder was used in the Sharon Paisley murder to support the aggravating circumstances Appellant presented a continuing threat to society and he was previously convicted of a felony involving the use or threat of violence to the person.

At trial, Appellant alleged the following mitigating evidence: (1) he contended he was not a principal in the commission of the murders; (2) his youthful age; (3) he believes in God; (4) he comes from a loving, caring and close family; (5) his life, even if he has committed the crimes charged, can still be salvaged.

■ We find the aggravating circumstances listed more than outweigh the mitigating evidence offered by Appellant. We now address the first question: whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor.

■ As noted above in our discussion of proposition nine, we find error in the amount and type of victim impact evidence presented to the jury. However, as our discussion of the aggravating circumstances shows, the victim impact evidence was not the only evidence presented during the sentencing stage.

As we noted earlier, the victim impact evidence is different from the evidence used to support the aggravating circumstances: the prosecutor uses the latter in an attempt to convince the jury the defendant is an appropriate candidate for the death penalty; the former is used to show the jury the victim deserved life. It seems clear that, although the victim impact evidence is designed to operate independently of evidence used in support of aggravating circumstances, the function of that evidence is the same: to give the jury "a measure of the seriousness of the offense and therefore ... a standard for determining the severity of the sentence that will be meted out." *Payne,* 501 U.S. at 820, 111 S.Ct. at 2606 (quoting S. Wheeler, K. Mann, and A. Sarat, *Sitting in judgment: The Sentencing of White–Collar Criminals* 56 (1988)). Both give the jury "as much information ... as possible when it makes the sentencing decision." *Id.* 501 U.S. at 821, 111 S.Ct. at 2606 (quoting *Gregg v. Georgia,* 428 U.S. 153, 204, 96 S.Ct. 2909, 2939–40, 49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)).

This is a classic trial error, as it is one "which occurred during the presentation of the case to the jury, and which may there-fore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." *Bartell v. State,* 881 P.2d 92, 98 (Okl.Cr.1994). Given the fact we have determined, independently of the victim impact evidence, there was sufficient evidence to support not simply one or two, but four aggravating circumstances in each murder, we can safely hold that portion of the victim impact evidence which was improperly admitted was harmless beyond a reasonable doubt. *See Burris v. State,* 642 N.E.2d 961, 966 (Ind.1994) (improperly admitted victim impact evidence harmless beyond a reasonable doubt); *Bivins v. State,* 642 N.E.2d 928, 956–57 (Ind. 1994) (holding victim impact evidence in its state court proceedings must be relevant to statutory aggravating circumstances; but holding introduction in that case harmless beyond a reasonable doubt); *State v. Carter,* 888 P.2d 629, 653 (Utah 1995) (holding victim impact evidence inadmissible under Utah proceedings, but finding admission in appellant's trial harmless). Accordingly, in light of all the evidence presented, we do not find the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor.

## IX. CONCLUSION

Appellant did not challenge his conviction for Count III, Possession of a Firearm After Former Conviction of a Felony. Therefore, the judgments and sentences of the trial court on all convictions are hereby **AFFIRMED.**

JOHNSON, P.J., and CHAPEL, V.P.J., concur.

LANE, J., specially concurs.

STRUBHAR, J., specially concurs, joins in LANE specially concurrence.

LANE, Judge: specially concurring.

I acknowledge and accept the fact that the Supreme Court of the United States ruled it is permissible under the Constitution of the United States for a state to pass laws that would allow "victim impact" evidence to be

introduced for purposes of sentencing in *Payne v. Tennessee*, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), and the Oklahoma legislature did precisely this when it amended 21 O.S.1994 § 701.10(C) and enacted the Victim Impact Statement Act, 22 O.S. 1994 § 984 et seq. These events went contrary to my concepts of the purpose of a sentencing proceeding.

I believe that the purposes of sentencing should be to tailor a punishment to fit the defendant. Simply put, we should be limited to determining if under the law the *defendant* deserves to die for his actions. With this decision, we are shifting some of the emphasis to the victim. I believe that this will introduce an arbitrary factor into the sentencing that has nothing to do with the defendant. Consider two scenarios of a crime where a robber kills the victim during the course of a robbery. In both, the robber has selected his victim at random and does not know anything about him. In the first, the victim is a minister of the gospel that is well loved by his family. He has never been in any trouble and has a family of a devoted wife and six small children who are dependent upon him for their entire support. In the second, the victim is a drug dealer who has been convicted of selling drugs to junior high school students. He does not have a family, or what family he does have would testify that he did not deserve to live and no longer meant anything to them. I think everyone would agree that the lives and lifestyles of these two victims could have a major impact upon the sentence received. Also, the lifestyles and lives of the victims do not have anything to do with the defendant himself.

I disagree with the thought that the State should be able to balance the mitigating evidence of the defendant's character and the impact that he has on his family with evidence of the impact of the death of the victim on his family. Sentencing is not a matter of balancing or comparing lives. It is a matter of determining what should be done with the defendant because of the crime that he committed. When a defendant presents his impact evidence he is offering it to mitigate and rebut the State's evidence of aggravation in-

troduced to show the defendant deserves to die. The State may contest this through cross examination and presenting conflicting evidence in rebuttal. This is the proper method to counter the defendant's evidence. It is not a contest to determine who has the better right to live and who most deserves to die.

However, as I previously stated, I accept the fact the Supreme Court has said the U.S. Constitution does not prohibit this type of testimony, and I cannot find anything in the Oklahoma Constitution that would contradict this. I reluctantly concur that victim impact testimony that is properly limited, as indicated in this opinion, can be used.